IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHNNIE L. McCULLOUGH, ) | CASE NO. 4:06CV3050 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF THE SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the appeal from the final order of the Commissioner denying the two applications for benefits under the Social Security Act made by Plaintiff Johnnie L. McCullough. McCullough first applied for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. (Tr. 76-78), and later applied for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 326-28).

Section 205(g) of the Act, codified at 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of Social Security under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

### *PROCEDURAL HISTORY*

McCullough's applications were denied initially (Tr. 33, 37-41, 339-44) and after reconsideration (Tr. 35, 44-48, 345-50). On March 23, 2005, an Administrative Law Judge (ALJ) rendered a decision in which she found that McCullough was not under a disability as defined in the Social Security Act at any time through the date of her decision (Tr. 13-31). On January 6, 2006, the Appeals Council of the Social Security Administration denied

McCullough's request for review of the ALJ's decision (Tr. 7-9). Thus, the ALJ's decision is the final decision of the Commissioner.

## *STATEMENT OF FACTS*

In his application filed on September 4, 2002, McCullough alleged that he was born in 1954, and became disabled on March 1, 2002. (Tr. 76, 157). On May 11, 2004, McCullough amended his alleged onset of disability to August 10, 2002, because he had performed substantial gainful activity until August 10, 2002. (Tr. 98, 354). In his Disability Report, McCullough said he was disabled due to dizziness, weakness, chest pain, back pain, asthma, and at times he became hot and sweaty. (Tr. 104, 125).

McCullough completed the eighth grade and received Job Corps training in welding and truck driving. (Tr. 110). He has worked as a welder, over-the-road truck driver, dump truck driver, and lawn care worker. (Tr. 105, 113-22).

McCullough's medical history includes an anterior lumbar interbody fusion at L4-5 and L5-S1, which was performed on November 17, 1999, by orthopedic surgeon Andrew Messer, M.D.. (Tr. 280-85). On May 11, 2000, Dr. Messer released McCullough to return to work but advised that he should not lift more than 30 pounds and should not perform work below knee level. (Tr. 295). In follow-up on October 9, 2000, Dr. Messer observed that McCullough had returned to truck driving and was performing full duties except that he was limited in bending and lifting. (Tr. 206). Dr. Messer stated that McCullough did not then need further medical care, but that he had a permanent partial impairment of 14 percent of the whole body. (Tr. 206).

Approximately nine months later, on June 25, 2001, McCullough sought treatment at the BryanLGH Medical Center West emergency room for chest pain. (Tr. 227-29). He

reported that the chest pain started two days earlier. (Tr. 227). An EKG, chest x-ray, and laboratory test results were normal. (Tr. 228). The examiner's diagnosis was chest pain, uncertain cause, though it did not appear to be cardiac in nature. (Tr. 228-29). McCullough obtained complete relief after being given Toradol. (Tr. 228). As part of his history, McCullough reported then that he was a recovering alcoholic but he "drinks a little most days" and his last marijuana use was "about a month ago" (Tr. 227).

On January 24, 2002, McCullough tested positive on a drug screen at work. (Tr. 233). Consequently, on February 7, 2002, McCullough was evaluated for substance abuse by Julie Hippen, MA, LMFT, the Southeast Regional Director of Lutheran Family Services of Nebraska. She recommended that he participate in an Intensive Outpatient program. (Tr. 233). McCullough commenced outpatient treatment on February 27, 2002, but did not complete it. McCullough's counselor recommended ongoing treatment and aftercare. (Tr. 233).

At the request of the State agency, Scott A. McPherson, M.D., examined McCullough in October 2002. (Tr. 237-41). McCullough reported a history of chest pain and shortness of breath for greater than 10 years, and recently, he was experiencing the shortness of breath even at rest. (Tr. 237). McCullough said he had been diagnosed with asthma three years earlier, and had been prescribed an inhaler, though he had not sought treatment nor refilled the inhaler in the interim. (Tr. 237). He reported that he smoked one pack of cigarettes a day. (Tr. 237). McCullough's complaints included feeling dizzy, chest pain that felt like he had been "hit in the chest with a hammer," frequent headaches, occasional tinnitus and sneezing, heartburn, chronic low back pain, and some loss of memory and concentration. (Tr. 238). He said he had not seen a doctor for over three

3

years though his shortness of breath was getting worse over time. (Tr. 238). McCullough also reported a history of depression, hospitalization for attempted suicide in 1994, and a past history of hepatitis. (Tr. 238-39, 297-99, 303-21). At the time, McCullough was using only over-the-counter medications, which he said did not ease his pain. (Tr. 239, 126).

Dr. McPherson observed that McCullough was not in acute distress. (Tr. 239). The respiratory and neurological exams were normal. Dr. McPherson reported that McCullough's deep tendon reflexes (DTRs) were 2+ and symmetrical, Romberg was negative, finger-to-nose was normal, and ambulation was normal. (Tr. 240). McCullough's upper and lower extremity strength was normal, though McCullough appeared to have pain when he sat up from a lying position on the table. (Tr. 240).

Dr. McPherson's impression was dyspnea - difficulty breathing, chest pain, possible asthma by history, history of depression, and history of hepatitis. (Tr. 240-41). Dr. McPherson "strongly urged" McCullough to seek medical attention if he had a recurrence of the chest pain and he urged him to seek further evaluation for the cause of the shortness of breath, and he advised him to stop smoking. McPherson stated that McCullough had some limitations as a result of his low back surgery, but the extent of actual limitation to activities of daily living was not clear to him. (Tr. 241).

On November 4, 2002, McCullough presented to the Lincoln-Lancaster County Health Department Indigent Care Clinic where he was examined by O. Garland Bare, M.D.. McCullough reported that he had lost his balance, fell frequently, and could no longer live alone. (Tr. 247). McCullough also stated that he had stopped driving and lost his job as a dump truck driver due to dizziness since late summer. (Tr. 247). He reported a past history of alcohol abuse and a 1 - 1 1/2 pack daily smoking habit. (Tr. 247). Dr. Bare, M.D.,

noted that McCullough clung to furniture when he tried to walk.  (Tr. 247).  Dr. Bare assessed vertigo,  prescribed Antivert, and arranged for laboratory testing.  (Tr. 247).

On November 18, 2002, Dr. Osborne noted that McCullough was self-referred to case management at CenterPointe for assistance with housing, SSDI, medication management, and daily living skills.  (Tr. 266).  He agreed to follow a treatment plan for at least six months and to follow through with his SSDI appeal until a final decision was made (Tr. 266).

On December 4, 2002, Les Veskma, M.D. from the county clinic completed a work slip: "Unable to work.  Duration-unknown, evaluation in progress. " (Tr. 243).  Dr. Veskma, through the Indigent Care Clinic, followed up with McCullough who reported that the previously prescribed Antivert had not helped his dizziness. (Tr. 324).  Laboratory test results included positive Hepatitis C and Hepatitis B core antibody results. (Tr. 324).  Dr. Veskma's assessment was vertigo associated with tinnitus, hearing loss, severe headache, disequilibrium; personality and cognitive changes; brief episodic loss of consciousness, history of alcoholism, tobacco abuse with probable chronic obstructive pulmonary disease ("COPD"), history of hepatitis B and probable chronic hepatitis C, and elevated blood pressure.  (Tr. 324).  An awake and asleep EEG were found to be normal.  (Tr. 293).

On December 17, 2002, Nurse Practitioner Michelle Lemon treated McCullough following his readmission to CenterPointe for case management services.  (Tr. 258). McCullough reported he was recently seen at the County Health Department and was sent to Lincoln General for a chest x-ray, MRI, and EEG.  (Tr. 258).  He complained of feeling down, depressed, crying episodes, and other depressive symptoms.  (Tr. 258).  His only medication was Mysoline for dizziness. (Tr. 258).  Nurse Practitioner Lemon's assessment

was depression with psychotic features and alcohol dependence, and she assessed a global assessment of functioning (GAF) score to McCullough of 40.[1] (Tr. 259). He was prescribed 50 mg of Zoloft every six hours for depression, and Zyprexa.

On January 2, 2003, McCullough presented to Dr. Veskma for follow up, stating that his previous complaints of difficulty breathing, dizziness and headache continued. (Tr. 323). Dr. Veskma reported that a recent chest x-ray was normal except it appeared to be hyper-expanded, and an MRI of McCullough's brain with and without contrast appeared to be normal. (Tr. 323). Dr. Veskma's assessment was alcoholism; episodes of vertigo associated with tinnitus, hearing loss, severe headache, and disequilibrium; tobacco abuse; COPD; history of hepatitis B and chronic hepatitis C with elevated liver function tests; and an upper respiratory infection. (Tr. 323). Dr. Veskma suggested a neurology consultation as "[i]t may be all these complaints are secondary to his alcoholism" (Tr. 323). It is unclear whether the neurology consultation was completed.

On January 7, 2003, Nurse Practitioner Lemon saw McCullough and noted that he was only taking one-half the prescribed Zoloft. (Tr. 257). He said he had seen a physician at the health department on January 2, 2003, and had now been referred to a neurologist for his shortness of breath and dizziness. (Tr. 257). He had no psychotic type symptoms.

---

[1] Global Assessment of Functioning (GAF) Scale represents the clinician's judgment and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-fitness. It does not include impairment in functioning due to physical (or environmental) limitations. A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas. A GAF score of 41-50 indicates serious symptoms, e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting, or serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual - Text Revision (DSM-IV-TR) 34 (2000 American Psychiatric Association).

(Tr. 257). NP Lemon increased his Zoloft dosage and doubled his Zyprexa dosage (Tr. 257).

On February 11, 2003, McCullough underwent an intake assessment and evaluation by Cindy Buesing, MA LMHF, Outpatient Program Director, CenterPointe, in connection with the Community Support program. (Tr. 253-56). McCullough had previously been seen in 1995, and he currently reported that he was having auditory and visual hallucinations. (Tr. 253). His gait and psychomotor movements were within normal limits. (Tr. 253). McCullough said he could not read or write, and Buesing observed that he appeared to have below-average intelligence, though his memory was intact. (Tr. 253).

McCullough reported a prior history of three DUI's and a criminal record that was several years old. (Tr. 254). McCullough reported that he began abusing alcohol at age nine, and he continued to drink a few beers a month. (Tr. 255). Though he had tried marijuana in his youth, he denied use of any other illicit drugs, which contradicts statements made in other medical records. (Tr. 255). McCullough reported a history of at least four hospitalizations for suicide attempts and his depression. (Tr. 255). Buesing's impression was major depressive disorder, recurrent, severe with mood congruent psychotic features and alcohol dependence with physiological dependence. (Tr. 256). She assigned a GAF score of 47. (Tr. 256).

On March 12, 2003, McCullough presented to Saint Elizabeth Regional Medical Center emergency room after a one-car motor vehicle accident (MVA) (Tr. 267-76). Chest, C-spine, T-spine, L-spine, and bilateral shoulder x-rays and an EKG were all normal (Tr. 268). He was diagnosed with cervical lumbar strain, complex lip laceration, and bilateral shoulder pain (Tr. 268).

On July 23, 2003, McCullough presented to Glen Lau, M.D., at the Indigent Care Clinic, complaining of a headache for the past three or four months, and dizziness. (Tr. 323). Dr. Lau's assessment was probable muscle contraction headaches, and prescribed Flexeril for that, continuing him also on the Zoloft and Zyprexa. (Tr. 323).

On February 12, 2004, McCullough presented to the BryanLGH Medical Center emergency room complaining of low back pain. (Tr. 290). He reported that he had done very well following his back fusion until one month previous when he starting having constant low back pain, worse with bending and walking, and radiating down to both feet. (Tr. 290). The best position was sitting, lying down was not too uncomfortable, and he had been sleeping fairly well. (Tr. 290). McCullough was prescribed Motrin 800 mg to take with food, and 5 mg Lortabs to take one to two times per day for pain. (Tr. 291). The examiner recommended that McCullough follow up with Dr. Messer. (Tr. 291).

On March 30, 2004, Nurse Practitioner Lemon examined McCullough and diagnosed major depressive disorder, recurrent and moderate, and alcohol dependency. (Tr. 251). His medication included Zoloft, Zyprexa, and Strattera, but he had stopped taking the Zyprexa and was only taking one-half the prescribed dosage of Strattera. (Tr. 251). When he presented, McCullough was filthy, poorly groomed, irritable, complained of emphysema, and was limping with an unsteady gait. (Tr. 251). He denied any drinking. (Tr. 251). McCullough had food stamps and was still living on a friend's property. (Tr. 251). Lemon restarted Zyprexa and advised McCullough to take the prescribed amount of Strattera. (Tr. 251).

On March 25, 2004, McCullough presented to Dr. Veskma with complaints of low back pain and COPD. (Tr. 322). Dr. Veskma prescribed Amoxicillin, Advair, and Tylenol,

8

and advised McCullough to continue using Albuterol. (Tr. 322). His assessment was exacerbation of COPD, chronic low back pain and spinal stenosis, tobacco abuse, and alcoholism. (Tr. 322). Dr. Veskma recommended McCullough take more extra strength Tylenol for his spinal stenosis, and instructed him on back exercises.

## THE ALJ's DECISION

The ALJ found that McCullough had the severe medically determinable impairments of: history of asthma, condition-status post back surgery with fusion, major depressive disorder, cirrhosis of the liver, and alcohol dependence in remission. (Tr. 30). The ALJ found that McCullough was not able to return to his past relevant work, and he did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 30).

The ALJ found that McCullough's residual functional capacity (RFC) was that he would be able to sit, stand and walk for up to six hours in the normal eight-hour workday with normal breaks. He would need to alternate sitting and standing in order to achieve maximum comfort. He would be able to lift and carry up to 30 pounds occasionally and 25 pounds frequently. He would be able to push and pull up to six pounds but should not perform work below knee level. He could occasionally stoop and crawl but should not be expected to work around cold or fumes due to his asthma. He would have moderate problems with activities of daily living; mild difficulty with social functioning; and moderate difficulty with persistence, concentration and pace. (Tr. 30).

The ALJ further found that the testimony of McCullough and his witness relative to the severity of his symptoms and resulting functional limitations was not entirely credible. (Tr. 30). Relying on the vocational expert testimony, the ALJ found that McCullough had

the RFC to perform other light work that existed in significant numbers in the regional and national economies, including being a cashier and a guard.  (Tr. 30).

## STANDARD OF REVIEW

The Eighth Circuit Court of Appeals has recently reiterated the scope of judicial review of a final decision of the Commissioner of Social Security:

> "It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Loving v. Dep't of Health & Human Servs.,* 16 F.3d 967, 969 (8th Cir. 1994). Instead, we review the ALJ's decision to determine whether it is supported by substantial evidence on the record as a whole. *Id.* "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Cox v. Apfel,* 160 F.3d 1203, 1206-07 (8th Cir. 1998).  Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision. *Id.* at 1207.  If, after conducting this review, we find that " 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings, we must affirm the decision of the Secretary." *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995) (alteration in original) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992)).

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

## STATEMENT OF ISSUES ON APPEAL

The issues identified by McCullough in his brief in support of the appeal include:

1. Whether the combination of impairments and educational deficits entitled him to benefits;

2. Whether the ALJ's RFC determination lacks the support of substantial evidence, and rather, result from the failure to apply the correct legal standards;

3. Whether the vocational testimony involved to deny McCullough's claim resulted from a legally defective hypothetical question; and

4. Whether the ALJ erred in assessing McCullough's credibility and the credibility of McCullough's non-expert witnesses.

The ultimate issue is whether the final decision of the Commissioner is supported by substantial evidence on the record as a whole adjudged under the proper legal standards.

### *ANALYSIS*

#### *McCullough's Burden*

To establish entitlement to disability benefits, McCullough must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which can be expected to end in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(i), 423(d)(1)(A), and 1382c(a)(3)(A); *Riley v. Shalala*, 18 F.3d 619, 621 (8th Cir. 1994); 20 C.F.R. §§ 404.1505(a) and 416.905(a).  The 12-month "duration" requirement applies to a claimant's "inability to engage in any substantial gainful activity," not just to his or her underlying impairment(s).  *See Barnhart v. Walton,* 535 U.S. 212, 218-22 (2002).

The ALJ considered McCullough's impairment by conducting the familiar five-step evaluation set forth in 20 C.F.R. § 404.1520(a)-(g) (2004). Under the regulations, the ALJ determines: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's RFC is sufficient for her to perform her past work; and finally, (5) if the claimant cannot perform his past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant

can perform given the claimant's RFC, age, education and work experience. *See Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998).

There are no issues about the first and second steps, but McCullough argues that at the third step the ALJ should have found that he has impairments that meet or exceed the presumptively disabling impairments specified in the regulations. In making this argument, McCullough contends that the ALJ erred in finding that he had an eighth grade education, when the evidence established that he was functionally illiterate. According to McCullough, his illiteracy, combined with his several severe physical ailments, demonstrate that he is disabled.

### *Credibility and RFC Findings*

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence. *See* 20 C.F.R. §§ 404.1545-46 and 416.945-46. Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility as to subjective complaints. *See Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir. 2001).

In evaluating a claimant's subjective complaints, the ALJ must examine, in addition to objective medical evidence, the factors identified in *Polaski v. Heckler*:

> "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to ... 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions." 739 F.2d 1320, 1322 (8th Cir. 1984). While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility. *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir. 2004). The ALJ may discount subjective complaints of pain if they are inconsistent with the evidence as a whole. *Polaski,* 739 F.2d at 1322.

The ALJ indicated that she had considered McCullough's allegations in accordance with 20 C.F.R. §§ 404.1529 and 416.929, Social Security Ruling (SSR) 96-7p, and Polaski. (Tr. 23-24). The ALJ found that McCullough's testimony, insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible. The ALJ also discounted the testimony of a witness, Walter Dondlinger, who appeared on behalf of McCullough, as his friend and former part-time employer. The ALJ stated that Dondlinger recited basically what McCullough had stated, and that Dondlinger may have had a pecuniary interest in the outcome of the application because Dondlinger permits McCullough to stay in a trailer on Dondlinger's property. There is no evidence that McCullough pays rent, or will ever be expected to pay rent, to Dondlinger, and the Court finds that is not a sufficient basis for discounting his testimony. (Tr. 25-26). In addition, it appears that Dondlinger testified from his personal observations of McCullough, and was not simply reiterating testimony provided by McCullough.

*Literacy Analysis*

McCullough argues that his testimony regarding limitations upon his ability to read and write were erroneously disregarded by the ALJ. In his brief, McCullough states that he is "vocationally illiterate." It is true that McCullough attended school through the eighth grade. (Tr. 360-74). However, McCullough contends that this evidence strongly suggests that the inclusion in the hypothetical question to the vocational expert of an intellectual level of 8th grade was grossly overstated.

The Commissioner argues that there is substantial evidence in the record to support the ALJ's determination that McCullough has an 8th grade educational level and is not illiterate. The only information regarding educational level that was provided by the ALJ

13

in the hypothetical question to the Vocational Expert ("VE"), Steve Kuhn, was that McCullough "has educational abilities commensurate with the eighth grade" and a reference to Exhibit 14E. (Tr. 316). Exhibit 14E is a vocational assessment that provides certain scoring, that is not explained, and includes the notation for 2002: "Given his below average aptitudes, no vocational alternatives were generated by this assessment." (Tr. 155). The Commissioner argues that the record reflects that McCullough is able to read and write, and states that McCullough was not in special education classes and points out that McCullough was able to complete the necessary forms for his claim.

Upon the Court's review of the evidence, however, I note that McCullough testified during the hearing that he had a special tutor during school, and, when he was asked whether he can read and write, he responded, "I can read a little bit." (Tr. 360). McCullough testified that he obtains the assistance of others when he has to complete forms, such as job applications, and that he takes the written portion of his driver's test by oral examination. (Tr. 360). He most recently took the written portion of the drivers test, orally, six time before he passed it. In connection with his trucking experience, McCullough testified that he relied on help from other drivers to prepare the trucking log. He has great difficulty reading and following maps, and he identifies traffic signs by shape. (Tr. 370-71).

The evidence also includes an SSA employee's notation, that McCullough's "educational level was low, and this was apparent in his speech and writing," corroborates McCullough's testimony. (Tr. 101). In addition, McCullough's friend and sometimes employer, Dondlinger, testified that "Johnnie hasn't had that much education at all," that "paperwork or reading is very hard for him," and that "if there's any instructions . . . I . . . do it all." (Tr. 358). Based on all this evidence, the Court finds that the ALJ's credibility

14

analysis with regard to McCullough's and Dondlinger's testimony about McCullough's literacy level is not supported by substantial evidence. I do not find that the reasons provided by the ALJ for discounting McCullough's testimony or Dondlinger's testimony, particularly as their testimony relates to McCullough's cognitive abilities, are supported by substantial evidence.

The Commissioner argues that "[s]ome difficulty with spelling and/or grammar does not equate with illiteracy as defined by the regulations."  The Commissioner cites *Starks v. Bowen*, 873 F.2d 187, 190 (8th Cir. 1989) for its statement that "a finding of literacy is warranted even when the claimant is able to read and write only very simple messages."

The regulations state:

> [i]lliteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. §§ 404.1564(b)(1) and 416.964(b)(1).  In *Hillier v. Social Sec. Admin.*, 486 F.3d 359 (8th Cir. 2007), the Eighth Circuit Court determined that a hypothetical was sufficient because, in addition to stating that the hypothetical claimant had an eighth grade education, the VE was also asked to assume that the claimant's IQ was "low average to borderline;" and that the claimant could understand, remember, and follow concrete instructions, and limited the work to "simple, concrete work, either unskilled or semiskilled." *Id.* The Eighth Circuit Court found that even though the ALJ in that case did not ask the VE to consider that the claimant was "functionally illiterate and had poor reading and writing skills," the ALJ's limitation to "simple, concrete work" captured the practical

consequences of the claimant's low average to borderline intellectual functioning. *Id.* at 366.

I find nothing in the ALJ's hypothetical that captures the practical consequences of McCullough's inability to maintain a trucking log, follow directions on a map, write simple sentences, or follow written instructions. (Tr. 367-374). The Court finds that there is not substantial evidence in the record to support a finding that McCullough's level of literacy is at the eighth grade level or, alternatively, that he experiences only "some difficulty with spelling and grammar." The Court finds that there is virtually no evidence to support the fact that McCullough's educational ability was accurately conveyed to the VE.

> "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted). Hypothetical questions should "set[ ] forth impairments supported by substantial evidence [on] the record and accepted as true," *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (quotation omitted), and "capture the 'concrete consequences' of those impairments," *Lacroix,* 465 F.3d at 889 (quoting *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir.1996)).

*Hillier*, 486 F.3d at 365. Because the Court concludes that, the hypothetical did not accurately reflect McCullough's educational level, the matter will be remanded for consideration of the effect of McCullough's limited cognitive ability.

On what may be a related note, I find that the ALJ's decision does not reflect that she considered the impact of McCullough's GAF scores. The Eighth Circuit Court has "considered GAF scores to be relevant evidence in other cases. *See, e.g., Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (noting that a GAF score of 50 'reflects serious limitations in the patient's general ability to perform basic tasks of daily life'"). *England v. Astrue,* 490 F.3d 1017, 1023 (8th Cir. 2007). On remand, the ALJ shall also

16

address the relevance, if any, of CenterPointe Nurse Practitioner Lemon's assessment of a GAF score of 40 for McCullough in December 2002, and mental health professional Cindy Buesing's assessment of a GAF score of 47 in February 2003. I note that McCullough testified that prescription medications had alleviated his depression. (Tr. 26, 366), and perhaps the limitations reflected in the GAF scores were disregarded based on that testimony. See *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)(quoting *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) ("if an impairment can be controlled by treatment or medication, it cannot be considered disabling.")

Finally, there is evidence that McCullough's respiratory abilities deteriorated after the applications were filed and throughout 2003 and 2004. By December 2002, McCullough had been diagnosed with COPD, and he continued to received treatment for COPD through December 2004, even while he maintained a pack-a-day cigarette habit. On remand, the Court will also direct the ALJ to address whether the medically determinable impairment of "a history of asthma" and the corresponding hypothetical assumption sufficiently encompass the physical limitations McCullough experiences due to COPD.

The Eighth Circuit Court of Appeals has held that a hypothetical question to a vocational expert need only include those impairments accepted as true by the ALJ. Based on the Court's decision to the remand for reconsideration of whether McCullough was functionally illiterate at the time of his applications for benefits, and the effect, if any, of the relatively low GAF scores and the diagnosis and treatment of COPD, the foundation of the VE's previously provided opinions may be called into question. If, on remand, the ALJ revises the RFC, then the ALJ may be required to solicit additional evidence from the

17

VE to ensure that a claimant with McCullough's limitations is able to sustain gainful employment, for example, as a cashier or a guard, two of the jobs previously identified by the VE as suitable.[2]

## CONCLUSION

I remand in part for further proceedings so the ALJ consider whether substantial evidence supports a finding of functional illiteracy rather than an eighth grade educational level, and whether the evidence supports any different treatment of the respiratory limitations based on the COPD diagnosis and treatment, and if so, what functional limitations these conditions impose, if any, upon McCullough. On remand, the ALJ should, if the evidence warrants, frame a revised hypothetical question to the vocational expert.

In reaching these conclusions the Court has not relied upon the additional material attached to his brief. On remand, the ALJ may determine whether the additional evidence should become part of the administrative record.

IT IS ORDERED that the decision of the Commissioner is reversed, the appeal is granted, and the matter is remanded for further proceedings consistent with this decision.

DATED this 20th day of February, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

---

[2] "Inaudible" is noted in the transcript in at least two key places discussing the range of work that McCullough might be able to perform. ( See Tr. 378-80).